# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 5:19-CR-239 |
| Plaintiff, | : | |
| | : | JUDGE DAN A. POLSTER |
| vs. | : | |
| | : | |
| RAMON WRIGHT, | : | **SENTENCING MEMORANDUM** |
| | : | **FOR RAMON WRIGHT** |
| Defendant. | : | |

Defendant Ramon Wright, through undersigned counsel, submits the instant Sentencing Memorandum for the Court's consideration and requests a sentence, as calculated and reviewed pursuant to Title 18, United States Code §§ 3553(a) and 3661, that is sufficient but not greater than necessary to achieve the statutory goals of sentencing. Counsel attaches the following Memorandum to assist the Court in fashioning Mr. Wright's sentence.

    Respectfully submitted,

    STEPHEN C. NEWMAN
    Federal Public Defender
    Ohio Bar: 0051928

    */s/ Jeffrey B. Lazarus*
    JEFFREY B. LAZARUS
    Assistant Federal Public Defender
    1660 W. 2nd Street, Suite 750
    Cleveland, Ohio 44113
    Telephone: (216) 522-4856
    Facsimile: (216) 522-4321
    jeffrey_lazarus@fd.org

    Attorney for Ramon Wright

**MEMORANDUM**

**I.     Introduction**

Ramon Wright has a sentencing guideline range of 46 to 57 months, at total offense level 16, Criminal History Category VI. For reasons detailed herein, Mr. Wright requests this Court impose a sentence at the low-end of his guideline range, that being 46 months. This request is based on the facts of the offense, his personal history and circumstances, the attached letters of support, and his physical health issues. This request is based on the statutory sentencing factors set forth in 18 U.S.C. § 3553(a), which will yield a sentence that is sufficient but not greater than necessary.

**II.    Legal Standard**

The goals and strictures of federal sentencing are set forth in 18 U.S.C. § 3553, which require courts to impose sentences that are sufficient, but not greater than necessary, to satisfy the purposes of sentencing. In order to achieve this goal, a sentencing court must consider the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the Sentencing Guidelines, the need to avoid unwarranted sentence disparities among defendants, the need to provide restitution to any victims of the offense, and the purposes of sentencing. 18 U.S.C. § 3553(a). In *Kimbrough v. United States*, 552 U.S. 85 (2007), the United States Supreme Court held sentencing courts must treat the Guidelines as the "starting point and the initial benchmark" when formulating a reasonable sentence, but also conduct a nuanced assessment of each individual case and the appropriateness of a Guidelines sentence in light of the other factors in 18 U.S.C. § 3553(a). *Kimbrough*, 552 U.S. at 101-08. The United States Code is clear that a wide range of information must be considered:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the

United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C § 3661.

### III. Facts surrounding Mr. Wright's offense and Procedural History

Ramon Wright wants this Court to fully understand the facts surrounding his offense in fashioning his sentence. The offense conduct is detailed in the presentence report at paragraphs 6 through 13, but additional facts are relevant. On the night of August 30, 2018, Ramon Wright was at a bar in the Akron area. It was around 2:00 a.m.; Ramon had been drinking and began talking to a female. Another person in the bar was very drunk and, for reasons unknown to Ramon, got very jealous Ramon was talking to this woman. Ramon had never met this guy before, and this guy started picking a fight with Ramon over this female. He and Ramon began fighting and suddenly this other guy pulled out a handgun and shot Ramon in the stomach. Ramon lost consciousness and has no recollection of the following events.

Emergency services were called and came to the bar. They found Ramon and transported him to Akron General Hospital. While in the ambulance, the medical personnel were treating Ramon, and began going through the contents of his pants pockets. Inside his pants they found a plastic bag containing a white powder, which was later determined to be 22.42 grams of fentanyl.

Ramon awoke in the hospital the next day. The gunshot perforated his intestines and the doctors had to install a colostomy bag so he could use the bathroom. His urethra and kidneys were also damaged. While he was being treated, there were complications with installing a breathing tube and Ramon suffered serious damage to his windpipe. The damage to his windpipe made it harder for air to get into his lungs, and caused him severe breathing trouble, which led to him being unable to walk more than a few steps without getting light-headed or gasping for air. He remained in the hospital for three days and was released. His digestive and breathing issues

remained, and he was told he would need significant follow-up care. Over the next month, he saw his doctors to determine what type of follow-up care he would need. He was told he would need surgery to repair his windpipe and a separate surgery to repair his intestines and reverse the colostomy bag. However, the doctors could not perform the surgeries until November because of the swelling in Ramon's body. Due to the breathing issues, he could not walk more than a few steps and got around by a wheelchair. He was in significant pain and believed he could stop breathing at any time. He was very afraid that he would never recover from his injuries.

A month later, on September 26, 2018, he was charged in the Summit County Court of Common Pleas for illegally possessing the drugs found on him the night he was shot. He voluntarily turned himself in to state authorities and was given a personal bond. While on bond, he continued to follow-up with medical appointments. He only left his home for medical reasons.

Ramon remained on bond to the state and was confined to a wheelchair. He was having a terrible time breathing and was wheezing heavily. He was in constant pain and had trouble sleeping. On October 1, 2018, a complaint was filed in the Northern District of Ohio, charging Ramon with illegally possessing the drugs on the night he was shot. The case was unsealed on October 25, 2018; that day Ramon was arrested and brought to the federal court for an initial appearance. A detention hearing was held before Magistrate Burke on November 1, 2018. At that hearing, Ramon sought pretrial release for the sole reason of receiving the proper medical care in the community, and so he could receive the surgeries he needed. Magistrate Burke ordered him detained, and he was remanded to NEOCC-CCA. Dkt. 9.

Subsequently, the defense and the government executed a joint agreement to permit Ramon to be released on a medical furlough so he could receive treatment. Dkt. 12. Ramon remained on furlough from January 17, 2019 through March 14, 2019. Dkt. 13, 18. During that

time, Ramon had four different surgeries. One surgery was to remove the colostomy bag and to clean up some of the scar tissue in his digestive track. The next surgery was to repair the damage to his windpipe. This surgery, however, had complications, and was unable to repair the damage. Ramon required two additional surgeries over the next month to repair the damage. In the interim, Ramon continued to have trouble breathing, talking, and meeting his daily living needs or self-care. When all the surgeries were completed, Ramon returned to NEOCC-CCA. He continues to have some pain in his stomach and digestive issues after eating, but overall has improved in this area. His windpipe is much improved, but will never be 100%. He continues to have trouble breathing and sleeping on occasion.

When the surgeries were completed, Ramon agreed to be charged by information. On April 18, 2019, the information was filed. Dkt. 20. In addition to the offense surrounding the drug charges, as detailed above, Ramon also agreed to charges and facts surrounding an offense relating to bank fraud. This bank fraud relates to actions taken in July of 2017 through February 2018, in which Ramon was involved in scheme to defraud banks where he assisted other people in fraudulently receiving proceeds from bank loans. Dkt. 20, Information, PageID 53-55.

On April 30, 2019, Ramon appeared before this Court and pled guilty to the information, under the terms of a written plea agreement. Dkt. 22. In pleading guilty, he assented to a factual basis surrounding his offense and took responsibility for this actions as set forth in the plea agreement. Dkt. 22, Presentence Report, ¶¶ 22-23. Both the plea agreement and the presentence report are in alignment on the sentencing guidelines calculations. Regarding the bank fraud offense, Ramon's base offense level is 7, and he receives a six-level enhancement because the loss amount was more than $40,000. PSR at ¶¶ 18-19; Plea Agreement at ¶ 17. Regarding the drug offense, Ramon's possession of 22.42 grams of fentanyl yields a base offense level of 18.

PSR at ¶ 24; Plea Agreement at ¶ 17. Because there are multiple counts at issue, the two counts are grouped, resulting in a one-level enhancement under U.S.S.G. § 3D1.4. PSR at ¶¶ 30-33; Plea Agreement at ¶ 17. The result is a total offense level of 19, from which Ramon receives a three-level reduction for his acceptance of responsibility, resulting in a final offense level of 16. As Ramon falls under Criminal History Category VI, his guideline range is 46 to 57 months.

### IV. Ramon Wright's personal history and characteristics

Ramon is a 31-year-old who has lived in the Akron area his entire life. Ramon grew up in a high-drug and high-crime area of Akron. His mother had a drug addiction for most of Ramon's upbringing. Ramon's father was never really a part of his life. His father served time in prison between 1989 and 1994, when Ramon was ages two to seven. Then, when Ramon was nine years old, his father was arrested and charged with aggravated murder in Summit County. His father was ultimately convicted and has been serving a life sentence in the Ohio prison system since 1996. With his father in prison and his mother suffering from a drug addiction, Ramon spent much of his childhood being raised by his grandmother. Being in a poor and crime-infested neighborhood in Akron, Ramon was exposed to a number of negative influences and violence.

At the age of sixteen, Ramon's mother moved to Atlanta, and took Ramon's younger brothers with her. PSR at ¶ 65. Ramon decided to stay in the Akron area so that he could complete high school. Ramon spent some of his time living with his girlfriend's parents, but also remained alone (and unsupervised) in his mother's vacant home. Ramon struggled to afford food, clothing, or other basic living necessities. He began to sell drugs so he could afford food and keep the utilities in the house active. He was able to graduate high school. PSR at ¶ 75.

Ramon and his high school girlfriend, Ivy Davis, remained together for several years and were married. They had three children together, whose ages are twelve, nine, and two. A couple

6

of years ago, Ramon and Ivy separated, but Ramon has remained dedicated to his children. He is now in a long-term relationship with Tokeia Robinson, and has become a step-father to her daughter as well. Nothing is more important to Ramon than his four children. Below is a picture of Ramon and his three children and his step-daughter; the one on the upper-right is of Ramon and his youngest child while Ramon was in the hospital recovering from his surgeries related to this case.



## V. Determining the appropriate sentence

Ramon recognizes the error of his ways in committing this offense, but asks this Court to consider his physical health issues in fashioning his sentence. He requests this Court impose a sentence at the low-end of his guideline range in light of the physical health issues he has suffered as a result of this offense. As detailed above, on the same night he was arrested for his drug offense Ramon was shot in the stomach, which resulted in him having very serious health issues. These health issues were debilitating and required several surgeries. The physical and mental anguish he suffered was very great and he was in agony for several months. To this date he has not fully recovered.

In addition to considering a defendant's history and characteristics (18 U.S.C. § 3553(a)(1)), a sentencing court must also consider "the need for the sentence imposed to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). In consideration of this need, the Sentencing Guidelines provide for downward departures based on the defendant's physical health condition. Specifically, the guidelines state:

> Physical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart downward; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.

U.S.S.G. § 5H1.4. While the Guidelines provide for a guidelines departure, Ramon does not seek any such departure, but asks this Court to consider the physical health issues in support of a sentence at the low end of his guideline range.

8

Many of Ramon's physical health issues have greatly improved, but he still requires some treatment and monitoring to ensure his health does not take a negative turn. Both his digestive issues and his windpipe will need to be carefully evaluated by the Bureau of Prisons and any issues he develops during his incarceration will require careful attention at a cost incurred by the taxpayers. It should be noted that the Department of Justice's Bureau of Prisons budget is already overstretched in providing medical services for inmates. *See* United States Department of Justice FY 2016 Agency Financial Report, p. 158.[1] This report details that from 2010 to 2014, Bureau of Prisons spending for medical services increased 24 percent, from $263 million to $327 million. *Id.* The report identifies inmate medical care as "an area that needs to be monitored closely" for containing costs. *Id.* Despite the rising costs, the report also indicates the Bureau of Prisons "is facing medical staffing shortages," and the "recruitment of medical professionals was one of the BOP's greatest challenges and that staffing shortages (a) limit inmate access to medical care, (b) result in an increased need to send inmates outside the institution for medical care, (c) contribute to increases in medical costs, and (d) can also impact prison safety and security." *Id.*

Judge Posner of the Seventh Circuit Court of Appeals has noted the lack of proper medical care in the Bureau of Prisons. In *United States v. Rothbard*, 851 F.3d 699 (7th Cir. 2017), Judge Posner issued a dissenting opinion as to the reasonableness of the district court imposing a guideline sentence. The defendant in *Rothbard* suffered from significant physical health and mental health issues, and at his sentencing hearing, the defendant argued for home confinement because there was concern the Bureau of Prisons could not meet his medical needs. *Rothbard*, 851 F.3d at 703 (Posner, J. dissenting). Judge Posner stated,

> Essentially the prosecution, the district court, and now my colleagues, ask that the Bureau of Prisons be trusted to give the defendant, in a federal prison, the medical

---

[1] Available at: *https://www.justice.gov/doj/page/file/910486/download* (last accessed August 22, 2019).

treatment that he needs for his ailments. Yet it is apparent from the extensive literature on the medical staff and procedures of the Bureau of Prisons (a literature ignored by my colleagues) that the Bureau cannot be trusted to provide adequate care to the defendant.

* * *

A national survey of inmates in federal, state, and local prisons found that among inmates with a persistent medical problem, 13.9% of federal inmates, 20.1% of state inmates, and 68.4% of local jail inmates had received no medical examination since incarceration. More than [20 percent of] inmates were taking a prescription medication . . . when they entered prison or jail; of these, 7232 federal inmates (26.3%), 80,971 state inmates (28.9%), and 58,991 local jail inmates (41.8%) stopped the medication following incarceration.

*Id.* at 704-05. Judge Posner then detailed some of the challenges the Bureau of Prisons faces in providing adequate care to inmates, much like the report cited above. *Id.* at 705-06. Judge Posner concluded that given these issues in treatment of federal inmates, the defendant "is entitled to a more informed and compassionate judicial response to his physical and mental illnesses than he has received from the district court and this court." *Id.* at 706.

Judge Posner's concerns apply in equal force to Ramon's case. Given the lack of proper medical care and an apparent policy need to continue to cut back on medical costs, it is reasonable to conclude that the Bureau of Prisons will present serious challenges in trying to meet Ramon's medical needs.

One must also consider Ramon's safety in the Bureau of Prisons from other inmates. Ramon's throat and stomach issues make him susceptible to serious health issues if assaulted by other inmates. Given his health issues, any physical assault to Ramon could be life threatening. There are little safeguards to prevent Ramon from being attacked or having some other type of incident that could jeopardize his health or safety. As 18 U.S.C. § 3553(a)(2)(D) requires this Court to consider the need for the sentence imposed to provide the defendant with the needed

10

medical care in the most effective manner, a sentence below his guidelines range is sufficient and justified.

### B. Letters of Support

In further support of a sentence at the low-end of the guideline range, Ramon provides this Court with Exhibit A, which includes nine letters of support from family and friends. The first letter is written by Ivy Davis, Ramon's ex-wife and the mother of their three children. The next four letters are written by Ramon's three children and step-daughter. Each of them discuss what a caring and devoted father Ramon is to his children. The following letter is written by Ramon's girlfriend, Tokeia Robinson. She further details Ramon's skills as a father. She explains the effect being shot had on Ramon, and the lifestyle changes he made as a result of this tragic incident. She explains that while Ramon was on his medical furlough, they lived together, and he was dedicated to both his sobriety and improving his life. The following letter is written by Ramon's aunt, who believes that Ramon is a good father and has sought to improve his life over the last year. The final two letters are written by friends of Ramon, detailing the growth and maturity he has demonstrated since his injury, and request leniency from this Court. In consideration of these letters, Ramon asks this Court to impose a sentence of 46 months.

### VI. Conclusion

In consideration of the facts surrounding the offense, Ramon's personal history, the attached letters of support, and physical health issues, he requests this Court impose a sentence of 46 months. Such a sentence is sufficient but not greater than necessary to achieve the statutory sentencing factors of 18 U.S.C. § 3553(a).

In addition to the request for a specific custodial sentence, Ramon also requests this Court make two recommendations as it relates to the service of his sentence at the Bureau of

Prisons. Ramon's history of substance abuse is detailed above and in the presentence report. *See* PSR at ¶¶ 73-74. Ramon believes he could benefit from drug treatment during his custodial sentence. He believes the Bureau of Prisons' Residential Drug Abuse Program (RDAP) will be a beneficial program. This 500-hour treatment program will consist of roughly nine to twelve months of individual and group therapy. He therefore requests this Court recommend he participate in the RDAP program.

He also requests this Court recommend him for the Second Chance Act. The Second Chance Act, codified at 18 U.S.C. § 3624(c), allows the Bureau of Prisons to permit defendants to serve up to twelve months of their custodial sentence at a halfway house. A recommendation from the Court, while not binding, will have significant weight in making this determination. Therefore, he requests this Court recommend that his sentence includes up to one year at the halfway house under the Second Chance Act, 18 U.S.C. § 3624(c).

Respectfully submitted,

STEPHEN C. NEWMAN
Federal Public Defender
Ohio Bar: 0051928

*/s/ Jeffrey B. Lazarus*
JEFFREY B. LAZARUS
Assistant Federal Public Defender
1660 W. 2nd Street, Suite 750
Cleveland, Ohio 44113
Telephone: (216) 522-4856
Facsimile: (216) 522-4321
jeffrey_lazarus@fd.org

Attorney for Ramon Wright